**SIGNED THIS: October 26, 2011**

_____
**THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE**

**UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE: ) | |
| ) | |
| **CENTRAL ILLINOIS ENERGY** ) | Case No. 09-81409 |
| **COOPERATIVE,** ) | |
| Debtor. ) | |
| ) | |
| ) | |
| **RICHARD E. BARBER, not individually** ) | |
| **but as trustee for the estate of Central Illinois** ) | |
| **Energy Cooperative,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adv. No. 10-08065 |
| ) | |
| **BANK OF AMERICA, N.A.,** ) | |
| **a national banking association,** ) | |
| Defendant. ) | |

**O P I N I O N**

This matter is before the Court on cross motions for summary judgment filed in this proceeding brought by Richard E. Barber, as Trustee of the estate of the Debtor, Central Illinois Energy Cooperative (DEBTOR), against Bank of America, N.A., a national banking association (DEFENDANT), to recover payments of $39,923.37, as fraudulent transfers.

*Background*

This adversary proceeding, brought by Richard E. Barber (TRUSTEE), is one of many which involves the relationship between the DEBTOR and certain related entities. The DEBTOR, an agricultural cooperative comprised of farmers in the Central Illinois area, was formed in 2001 for the purpose of constructing, owning and operating a grain handling facility and administration building. The DEBTOR owned a controlling interest in Central Illinois Holding Company, LLC (HoldCo), the holding company for Central Illinois Energy, LLC (CIE), the entity formed in March, 2004, for the purpose of constructing, owning and operating an ethanol production facility and waste-coal fired power generating facility. The grain handling facility being constructed by the DEBTOR was located on land adjacent to the ethanol plant being built by CIE. The DEBTOR'S members are Central Illinois farmers who intended to grow and sell corn, through the DEBTOR, to CIE for processing into ethanol and other byproducts. On March 31, 2006, the DEBTOR entered into a lease of the grain handling facility and the administrative office building with CIE, whereby CIE agreed to pay rent of $60,000 per month for an initial term of ten years. Under the terms of the lease, the DEBTOR remained responsible for completing construction.[1]

After encountering financial difficulties, the DEBTOR, on or about June 12, 2007, transferred, subject to a conditional repurchase obligation, substantially all of its assets, including the grain handling facility and numerous corn delivery contracts to Green Lion Bio-Fuels, LLC. Delays and cost overruns continued to plague the projects and the general contractor on the ethanol plant ceased working in November, 2007. CIE filed a Chapter 11

---

[1] The lease, dated March 31, 2006, obligated the DEBTOR to construct the grain handling facility and the administrative office building by June 1, 2007. The DEBTOR did not meet that deadline.

2

petition on December 13, 2007, and an order for conversion to Chapter 7 was entered on August 4, 2008. Pursuant to sections 363(b) and (f) of the Bankruptcy Code, substantially all of CIE'S assets were sold to New CIE Energy Opco, LLC, by order entered April 24, 2008.

According to Mike Smith, the DEBTOR'S President and Chief Executive Officer, as well as CIE'S General Manager, because neither the DEBTOR nor CIE were able to obtain a credit card, he applied for and received a credit card in his name issued by the DEFENDANT. Smith asserts that he used the card solely for the business expenses of CIE (not the DEBTOR) during 2007 such as gasoline, travel expenses, computers and other equipment, as well as for a cash advance to pay CIE'S employees. Smith states that he routinely submitted the credit card statements to the DEBTOR (not CIE), that the DEBTOR used its funds to pay the statements, but that CIE thereafter reimbursed the DEBTOR.

A Chapter 11 involuntary petition was filed against the DEBTOR on May 1, 2009. The DEBTOR did not file an answer and an order for relief was entered on June 18, 2009. The case was converted to Chapter 7 on July 16, 2009, on the motion of the United States Trustee. With approval of the Court, and no one appearing for the DEBTOR, the schedules were prepared by HWS Energy Partners, LLC, the petitioning creditor. The schedules filed on behalf of the DEBTOR disclose that it held 17.75 million units of HoldCo, constituting a 71% ownership. HoldCo, included in the list of the DEBTOR'S business interests in the DEBTOR'S Statement of Financial Affairs, is identified as the holding company for CIE.

The TRUSTEE brought this adversary proceeding to recover the following credit card account payments made to the DEFENDANT as fraudulent conveyances on the theory that the transfers were not for the benefit of the DEBTOR, but applied to the personal

3

indebtedness of Mike Smith.[2]

| Date | Check No. | Amount |
|---|---|---|
| August 24, 2007 | 2198 | $ 200.00 |
| October 9, 2007 | 2224 | 28,603.90 |
| October 22, 2007 | 2250 | 6,064.47 |
| November 26, 2007 | 2309 | 125.00 |

The TRUSTEE also seeks to recover a wire transfer of $4,930 made on October 1, 2007, as having been made on behalf of various shareholders of the DEBTOR. Count I of the complaint seeks avoidance of the transfers pursuant to section 548(a). Counts II and III assert similar claims under the Illinois Uniform Fraudulent Transfer Act, alleging constructive fraud under sections 5(a)(2) and 6(a). 740 ILCS 160/5(a)(2), 6(a).[3] Both parties have moved for summary judgment.

Under Federal Rule of Civil Procedure 56(c), made applicable to adversary proceedings in bankruptcy by Federal Rule of Bankruptcy Procedure 7056, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In order to prevail on a motion for summary judgment, the moving party must establish there is no genuine issue of material fact as to any essential element of the claim. *Anderson v. Liberty Lobby, Inc.*,

---

[2]In his complaint, the TRUSTEE also sought avoidance of a payment made to the DEFENDANT on July 18, 2007, in the amount of $3,439.46. After discovering that CIE reimbursed the DEBTOR for that payment, the TRUSTEE withdrew that transfer from his claim.

[3]Counts II and III, brought under companion fraudulent transfer provisions under Illinois law, require substantially similar showings. The DEFENDANT, unlike the TRUSTEE, has not limited its motion for summary judgment to Count I. For purposes of this Court's ruling, no analytical distinction will be made between the claims asserted under the Bankruptcy Code and those made pursuant to state law.

4

477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When a moving party has met its initial burden of showing there is no genuine issue of material fact, the burden shifts to the non-movant to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial. Inferences to be drawn from underlying facts must be viewed in the light most favorable to parties opposing the motion. *In re Chambers*, 348 F.3d 650 (7th Cir. 2003). A material factual dispute is sufficient to prevent summary judgment only when the disputed fact is determinative of the outcome under applicable law. It is not the role of the trial court to weigh the evidence or to determine its credibility, and the moving party cannot prevail if any essential element of its claim for relief requires trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511.

The filing of cross motions for summary judgment does not by itself indicate the absence of genuine issues of material fact. *In re Schreiber*, 163 B.R. 327, 331 (Bankr.N.D.Ill. 1994). The merits of each motion must be evaluated independently of the other. *In re Citron*, 428 B.R. 562 (Bankr.E.D.N.Y. 2010). The court must ensure that the non-moving party gets the benefit of having all inferences drawn in its favor. *In re Crystal Apparel, Inc.*, 220 B.R. 816 (Bankr.S.D.N.Y. 1998). Where a genuine issue of material fact exists, summary judgment is not appropriate for either party. *In re TennOhio Transp. Co.*, 247 B.R. 715 (Bankr.S.D.Ohio 2000).

The TRUSTEE seeks summary judgment on Count I of his complaint, brought under section 548(a)(1)(B).[4] That section provides, in relevant part, as follows:

> (a) (1) The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made . . . on or within two years before the

---

[4] Alternatively, Count I of the complaint includes a claim for actual fraud under section 548(a)(1)(A) of the Bankruptcy Code. The TRUSTEE does not pursue that claim in his motion.

5

>   date of the filing of the petition, if the debtor voluntarily or involuntarily–
>   * * *
>   (B) (i) received less than a reasonably equivalent value in exchange for such transfer . . . and
>   (ii) (I) was insolvent on the date that such transfer was made . . . or became insolvent as a result of such transfer . . . .

11 U.S.C. § 548(a)(1)(B).

For the TRUSTEE to prevail on his motion for summary judgment on his fraudulent conveyance claims, the Court must find that the undisputed evidence establishes that (1) an interest of the DEBTOR was transferred, (2) within two years of the date of the filing of the petition, (3) that the DEBTOR received less than reasonably equivalent value in exchange for the transfer, and (4) that the DEBTOR was insolvent on the date of the transfer or became insolvent as a result of the transfer. For the DEFENDANT to prevail against the TRUSTEE on its motion for summary judgment, it must demonstrate that the TRUSTEE'S evidence is insufficient to establish an essential element of the TRUSTEE'S claim.

The determination of whether a debtor received reasonably equivalent value in exchange for a transfer does not require a dollar-for-dollar equivalent. *Barber v. Golden Seed Co., Inc.*, 129 F.3d 382 (7th Cir. 1997); *In re Advanced Telecommunication Network, Inc.*, 490 F.3d 1325 (11th Cir. 2007). As a general rule, a fraudulent transfer occurs when a debtor pays the debt of another, when the debtor itself is not obligated on the debt. *In re Integrated Agri, Inc.*, 2005 WL 3088612 (Bankr.C.D.Ill. 2005). An exception to that general rule has been recognized, however, where the debtor benefits indirectly from paying the debt of a third party. *In re Image Worldwide, Ltd.*, 139 F.3d 574 (7th Cir. 1998); *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979 (2nd Cir. 1981). It is also possible that the DEBTOR received value in the form of the third party's agreement to pay back the DEBTOR, as more fully

6

discussed below.

Determination of "reasonably equivalent value" is a two-step process. A court must first determine whether the debtor received something of value in return for the transfer of its funds or property. If some value was received by the debtor, the court must then determine the value of what was received and weigh that against the value of the transferred funds or property. *In re Phillips,* 379 B.R. 765, 779 (Bankr.N.D.Ill. 2007). Whether the debtor received any value at all and, if so, its worth, are determined as of the time of the transfer. *Id.; In re Hinsley,* 201 F.3d 638, 644 (5th Cir. 2000); *In re Gluth Bros. Const., Inc.,* 424 B.R. 368, 376 (Bankr.N.D.Ill. 2009); *In re M. Fabrikant & Sons, Inc.,* 2009 WL 3806683 (Bankr.S.D.N.Y. 2009) (value that transferor received must be determined at the time of the transfer "without the benefit of hindsight"). A third-party's agreement to reimburse the debtor for the transfer may constitute reasonably equivalent value.

There is no dispute that the DEBTOR'S funds were transferred within two years of the date of the filing of the petition. In support of his motion for summary judgment, the TRUSTEE, maintaining that the DEBTOR did not receive reasonably equivalent value in exchange for the transfers, contends that the transfers did not benefit the DEBTOR, since the payments on the credit card account satisfied the indebtedness of Mike Smith, personally, and that the funds for the wire transfer were for the benefit of the DEBTOR'S shareholders.[5] The TRUSTEE'S claim concerning the credit card charges is related to an intercompany account, maintained as part of the DEBTOR'S general ledger, which reflects

---

[5]The Illinois Agricultural Co-Operative Act uses the term "member" to refer to both members of associations without capital stock and holders of common stock in associations organized with capital stock. 805 ILCS 315/2(a). The TRUSTEE'S use of the term "shareholder" implies that the DEBTOR was organized with capital stock and that its members were all holders of common stock issued by the DEBTOR.

7

payments made by the DEBTOR for the benefit of or in satisfaction of liabilities of CIE. The TRUSTEE submits the report of Neil Gerber, the expert he engaged to conduct an insolvency analysis of the DEBTOR. Based upon an examination of the DEBTOR'S books and records, Gerber prepared a schedule of intercompany transactions, listing advances made on behalf of CIE and reimbursements made to the DEBTOR by CIE.[6] According to Gerber's analysis, the DEBTOR was not reimbursed by CIE for any funds it advanced on CIE'S behalf after August 6, 2007.

The TRUSTEE asserts that the wire transfer of $4,930, initiated by the DEBTOR from its account at MidAmerica National Bank to LaSalle Bank, was made in payment of a fee charged for the issuance of a letter of credit which was later drawn upon and ultimately paid for the benefit of CIE. The TRUSTEE maintains that the DEBTOR was never an intended beneficiary of the letter of credit. The TRUSTEE seeks to recover that transfer from DEFENDANT, noting that it acquired LaSalle Bank, effective October 1, 2007, the same day the wire transfer was initiated. The TRUSTEE submits the Credit Agreement dated April 24, 2006, between CIE, HoldCo and Credit Suisse, whereby Credit Suisse's agreement to loan $87,500,000 to CIE was conditioned upon receiving a letter of credit provided by LaSalle Bank in the amount of $1,960,000, as well as receipt of a letter of credit being provided by Farm Credit Services, PCA in the amount of $3,059,000. Also submitted by the TRUSTEE is the capital contribution agreement for HoldCo, setting forth the DEBTOR'S capital contribution as including the letters of credit required by the Credit

---

[6] The copies of the checks issued by the DEBTOR in payment of the credit card invoices which are attached to the complaint are, for the most part, illegible. The Court notes that the payment which the TRUSTEE seeks to avoid in the amount of $28,603.90, made on October 9, 2007, does not correspond to the entry made on the schedule of intercompany transfers prepared by Gerber. The latter shows a payment by the DEBTOR to Bank of America on October 9, 2007, in the amount of $3,603.90, as being due from CIE. Copies of the credit card statements attached to the TRUSTEE'S motion, however, show a payment of $28,603.90 being credited on October 5, 2007.

8

Agreement.

The DEFENDANT'S motion for summary judgment is premised on its position that the DEBTOR received reasonably equivalent value, asserting that although the DEBTOR initially paid the credit card charges incurred by Mike Smith on behalf of CIE, the DEBTOR submitted the paid invoices to CIE and CIE reimbursed the DEBTOR for those expenses. In support of its motion, the DEFENDANT submits the affidavit of Michael W. Smith, the DEBTOR'S President and Chief Executive Officer, as well as CIE'S General Manager. Smith asserts that he received a credit card statement each month, which he submitted to the DEBTOR for payment; that the DEBTOR issued checks directly to the DEFENDANT in payment of the charges incurred for CIE'S business expenses; that the DEBTOR submitted the paid invoices to CIE and CIE reimbursed the DEBTOR; and that in December 2007, he was not reimbursed by either the DEBTOR or CIE for approximately $5,000 to $5,500 in expenses which were charged to the credit card for the benefit of CIE.[7]

The Court notes that the schedule prepared by Gerber reflects that CIE reimbursed the DEBTOR the sum of $95,000 on September 28, 2007, and the sum of $44,500 on October 1, 2007. Those reimbursements from CIE were made after the first credit card payment and the second reimbursement was received on the same day as the wire transfer. The second credit card payment was made only eight days thereafter. The proximity of CIE'S reimbursements with those payments by the DEBTOR poses questions unanswered by Gerber's analysis. It does not appear from his report that Gerber interviewed any officers or employees of the DEBTOR or CIE to determine the nature of their agreement as to the

---

[7]The DEFENDANT claims that the wire transfer of funds from the DEBTOR'S account was not a charge on the credit card issued to Mike Smith and accordingly, is not recoverable from the DEFENDANT. In response, the TRUSTEE clarified that avoidance of the wire transfer was unrelated to the other transfers made in payment of the charges on the credit card issued by the DEFENDANT.

9

intercompany transfers and resulting obligations. Rather, Gerber, asserting that the reimbursements were not earmarked for specific payments, concluded that no advances which occurred after August 6, 2007, were reimbursed. Gerber's assumption, that the parties intended reimbursements to be applied on a first in/first out methodology, is just that, an unproven assumption. Standing in direct contradiction to Gerber's conclusion that the DEBTOR was never reimbursed for the payments, is the sworn declaration of Mike Smith that the DEBTOR was in fact reimbursed for the payments made to DEFENDANT on behalf of CIE.[8]

Gerber's report and Smith's declaration provide contradictory evidence as to whether the DEBTOR was or was not reimbursed for the challenged transfers, a material fact. The Court disagrees with the parties, however, who both argue that the fact of reimbursement is dispositive. The proper focus of the inquiry is whether the DEBTOR received something of value *at the time of each transfer in question.* Based upon the record before the Court, at most what the DEBTOR received was CIE'S agreement, in the form of an unsecured promise, to reimburse the DEBTOR for the payments. But the factual record is undeveloped.

There is no direct evidence in the record of the terms of the reimbursement

---

[8]In its response to the TRUSTEE'S motion for summary judgment, the DEFENDANT claims that the TRUSTEE has failed to supplement his answer to its discovery request, made nearly one year ago, to produce all checks or other forms of payment that were made by CIE to the DEBTOR as reimbursement for the transfers set forth in the complaint. The TRUSTEE'S response, in its entirety, provides:

> Trustee objects to Request to Produce No. 5 on the ground that the request assumes a fact as to which there is no evidence, to wit, that CIE reimbursed [the DEBTOR] for any Transfer described in the Trustee's Complaint. Further answering said request, the Trustee is unaware of any specific reimbursement by CIE which relates, in any way, to the challenged Transfers. Investigation continues.

The DEFENDANT suggests that additional discovery may shore up its position that the DEBTOR was fully reimbursed for the payments which the TRUSTEE seeks to avoid.

10

agreement between the DEBTOR and CIE. In fact, there is no direct evidence that there actually was a contract between those entities governing reimbursement. No writing is referred to. No recitation of an oral contract is made. No minutes of any board meeting where such an agreement was approved are attached. In his declaration (Doc. 17, Ex. A), Mike Smith practically goes out of his way to avoid the issue. He says he used the credit card solely for the business expenses of CIE, but submitted the statements each month to the DEBTOR to pay. Why wasn't he submitting the statements to CIE to pay? Smith never says. He claims the DEBTOR received "fair value" for the payments because it eventually was reimbursed by CIE. But value is measured by what was received at the time of the transfer. *In re Chomakos*, 69 F.3d 769, 770-71 (6th Cir. 1995); *In re Morris Communications NC, Inc.*, 914 F.2d 458, 466 (4th Cir. 1990). Perhaps the DEBTOR received a contemporaneous contractual obligation for reimbursement by CIE. But perhaps there was no such contract. Maybe CIE decided on an *ad hoc* basis to reimburse the DEBTOR only if and when it had adequate funds to do so. It is not even clear who was making that decision for CIE. Was it Smith? Was it CIE'S managers? Perhaps it was Credit Suisse. Facts that bear on these questions are absent. To the extent that inferences could be drawn from circumstantial evidence, those inferences must be drawn in favor of the non-moving party.[9]

The DEFENDANT does make the alternative argument that if any of the payments made by the DEBTOR to the DEFENDANT for charges which benefitted CIE were not reimbursed, the DEBTOR received a dollar-for-dollar account receivable. As discussed above, the record does not contain adequate proof of this alleged fact. Even then, the fact

---

[9]Of course, if CIE and the DEBTOR were parties to a reimbursement agreement and if CIE did timely reimburse the DEBTOR for the payments at issue, that is strong evidence that CIE'S promise had value. If the transfers were not reimbursed, it will be important to know the contractual terms of repayment for comparison against CIE'S anticipated cash flow. A failure to repay a loan when promised is often highly probative of a lack of value to the unsecured promise of repayment.

11

that a debtor's payment of the debt of another person or entity is intended to be a "loan," not a gift, is far from dispositive on the issue of whether a contemporaneous, unsecured promise to repay constitutes reasonably equivalent value in exchange for the payment. That question can only be answered by examining the promisor's financial circumstances in order to ascertain the likelihood of repayment. *See, e.g., In re Advanced Telecommunication Network, Inc.,* 490 F.3d 1325, 1337 (11th Cir. 2007); *In re USA Commercial Mortg. Co.,* 2011 WL 2516270 (9th Cir. 2011); *Caterpillar, Inc. v. Jerryco Footwear, Inc.,* 880 F.Supp. 578, 592 (C.D.Ill. 1994); *In re Nat. Century Financial Enterprises, Inc.,* 341 B.R. 198, 218 (Bankr.S.D.Ohio 2006). It thus appears that CIE'S ability to repay the DEBTOR is a material, perhaps critical, factual issue.[10]

The DEFENDANT also raises the specter of the "unity of interest" doctrine, contending that the DEBTOR received an indirect economic benefit from the payment of CIE'S obligation, noting that at the time of the transfers, the DEBTOR owned more than 80 percent of the membership interest in CIE. The DEFENDANT'S argument evokes the "identity of interest" exception which occurs where the debtor and the third party are so related or situated that they share an identity of interest because what benefits one will benefit the other.[11] *In re Renegade Holdings, Inc. v. Huntington National Bank*, 2011 WL 3962284 (Bankr.M.D.N.C. 2011) (quoting *In re Ear, Nose and Throat Surgeons of Worcester,*

---

[10]Even if CIE itself was insolvent, whether CIE had access to funds to pay the DEBTOR becomes important. Even insolvent entities are able to pay their debts as they come due if they have access to a line of credit or another source of cash flow. A promise to pay that is premised on a reasonable likelihood of available funds may have value despite the obligor's negative net worth. Gerber's report does not address CIE'S access to funds at the time of the transfers, and it is doubtful this information could be extracted merely from a review of CIE'S books.

[11]Both the DEBTOR and CIE were pre-operational, with their facilities not yet completed. The Court is not aware of any reported opinion where the identity of interest doctrine has been applied to two non-operating entities.

12

*Inc.*, 49 B.R. 316 (Bankr.D.Mass. 1985).  As the court in *Renegade* noted, however, a transfer to a solvent subsidiary is generally considered to be for reasonably equivalent value whereas a transfer by a parent company to a wholly owned subsidiary that is insolvent does not result in reasonably equivalent value.  *See In re Pace*, --- B.R. ----, 2011 WL 1870054 (Bankr.W.D.Tex. 2011).[12]  Those arguments, calling for a determination of the solvency of CIE, are beyond the sparse record submitted by the parties in this proceeding.

Alternatively, the DEFENDANT contends that the TRUSTEE is not entitled to summary judgment because there remain issues of material fact concerning whether the DEBTOR was insolvent in the late summer and fall of 2007, when the transfers were made. The DEFENDANT points to loans made to the DEBTOR in September and October of 2007, in the amounts of $80,000 and $1,000,000, by minority members of HoldCo, the holding company for CIE.  It is difficult to see what weight evidence of such other loans should be given as part of the balance sheet analysis; likely none.  More to the point, the DEFEN- DANT submits the DEBTOR'S audited financial statements as of June 30, 2006 and June 30, 2007.  The balance sheet as of June 30, 2007, schedules total assets of $121,774,996 and total current and long-term liabilities of $107,685,868, for a positive net worth of $14,089,128.[13] Gerber disagrees, but the DEBTOR'S insolvency as of the time of the challenged transfers is disputed and material.

---

[12]Whether that rule has any application where the subsidiary is not wholly owned, but debtor owns a controlling interest, is not a matter which the Court is required to address here.

[13]The financial statements are consolidated and include the accounts of the DEBTOR, the accounts of CIE and the DEBTOR'S 71% interest in HoldCo. The breakdown of assets and liabilities between the DEBTOR and CIE is not clear. Neither is it clear how the DEBTOR'S 71% interest in HoldCo was applied; the auditing accountant does not note whether any separate assets and liabilities of HoldCo are included.

With respect to the wire transfer of $4,930 to LaSalle Bank on October 1, 2007, the DEFENDANT does not dispute the TRUSTEE'S assertions that the transfer was in payment of a letter of credit fee charged by LaSalle Bank for its issuance of a letter of credit for the benefit of CIE and/or its construction lender, Credit Suisse. The DEFENDANT'S position that the DEBTOR may have realized an identity of interest benefit, because of its majority stake in HoldCo, enables it to get past summary judgment on this issue. The DEFENDANT'S argument that the claim should be stricken because it does not involve Mike Smith's credit card is baseless.

For the foregoing reasons, the Court determines that genuine issues of material fact exist and that both motions for summary judgment must be denied. This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###